UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
ENIVID. INC., et al.,

                    Debtors.

Chapter 11
Case No. 03-11472-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

JAMES B. BOLES, LIQUIDATION
TRUST REPRESENTATIVE OF THE
LIQUIDATING TRUST OF ENIVID, INC.

                    Plaintiff,

v.

Adv. P. No. 04-1439-JNF

ANDREW J. FILIPOWSKI,
PAUL HUMENANSKY,
MICHAEL CULLINANE AND
JUDE SULLIVAN,

                    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MEMORANDUM OF DECISION

I.      INTRODUCTION

The contested matters before the Court are the following: (1) "Defendant Andrew

J. Filipowski's Motion to Dismiss Counts I, V-VII, and XII-XIV of the First Amended

Complaint" through which defendant Andrew Filipowski ("Filipowski") seeks to dismiss,

pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) (the "Filipowski Motion to Dismiss"), Counts

1

I, V through VII and XII through XIV of the First Amended Complaint (the "Complaint")

filed by James B. Boles, the Liquidation Trust Representative (the "Plaintiff") of the

Liquidation Trust dated December 20, 2004, established pursuant to the enivid, inc.[1]

"Official Committee of Unsecured Creditors' Amended Plan of Liquidation Under Chapter

11 of the Bankruptcy Code dated September 30, 2004, as Modified November 23, 2004" (the

"Plan"); (2) the "Motion to Dismiss Claims Against Defendant Paul Humenansky" through

which defendant Paul Humenansky ("Humenansky") seeks to dismiss Counts II, V

through VIII, and XIII through XV of the Complaint[2] (the "Humenansky Motion to

Dismiss"); (3) "Michael P. Cullinane's Motion to Dismiss Plaintiff's First Amended

Complaint" through which defendant Michael Cullinane ("Cullinane") seeks to dismiss

Counts III, V through VIII and XII of the Complaint (the "Cullinane Motion to Dismiss");

---

[1] By order dated October 6, 2004, the Court substantively consolidated the Chapter 11 case of enivid, inc. (f/k/a divine, inc.) with the bankruptcy estates of the following related entities: Open Market, Inc., enivid Managed Services, Inc., enivid DR Corporation, Viant Corporation, eShare Communications, Inc., Delano Technology Corp., enivid technology ventures, iCentral, Inc., Inventions, Inc., enivid/emicom, Inc., SageMaker, Inc., Waypoint Software Corporation, Preceptual Robotics, Inc., enivid Global Services, Inc., eprise Corporation, Denalii, Inc., Melita Finance, Inc., SMI Holding Corp., Retrieval Technologies, Inc., enivid international, Inc., enivid software, inc., Opinionware.com, Inc., Melita Intellectual Property, Inc., smallwonders software!, inc., Open Market Securities Corporation, Futuretense Corporation, RWT Corporation, LOTN, Inc., Eprise Securities Corp., SageMaker (Europe), Inc., Global Recall, Inc., databites, inc., enivid interVentures, Inc., enivid Ireland, Inc., Folio Corporation, Venture Capital Unlimited Acquisition, enivid Synchrony Communications, Inc., Softmetric, Inc., Air enivid, Inc., and SM2 Holding Corp.

[2] Although Humenansky's Motion to Dismiss makes reference to Count XV, no basis is asserted in his memoranda for dismissal of that count.

and (4) "Defendant Jude Sullivan's Motion to Dismiss the Amended Complaint" through

which defendant Jude Sullivan ("Sullivan") seeks dismissal of all Counts in the Complaint

against him (the "Sullivan Motion to Dismiss") (collectively, the "Motions to

Dismiss")(Filipowski, Humenansky, Cullinane and Sullivan, each a "Defendant" and,

collectively, the "Defendants").[3]

Each of the Defendants filed Memoranda of Law in support of their respective

Motions to Dismiss[4] to which the Plaintiff filed responsive memoranda and each Defendant

filed a reply brief.  On November 14, 2005, the Court conducted a hearing after which it

took the Motions to Dismiss under advisement.  On December 22, 2005, the Defendants

jointly filed a "Motion for Leave to Supplement Briefing on Defendants' Motion to

Dismiss" (the "Motion to Supplement") through which they sought to supplement their

arguments in view of the recent case of (Alberts v. Tuft) In re Greater Southeast

Community Hospital Corp., 333 B.R. 506 (Bankr. D. D.C. 2005).  The Court allowed the

Motion to Supplement on December 28, 2005.  On January 9, 2006, the Plaintiff filed a

response to the Motion to Supplement, and the Defendants filed a joint reply on January

19, 2006.

---

[3] Each Defendant in this Adversary Proceeding has filed a Motion to Dismiss
pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R.
Bankr. P. 7012(b), for failure to state claims upon which relief may be granted and
pursuant to Fed. R. Civ. P. 9(b), made applicable to this proceeding by Fed. R. Bankr. P.
7009, for failure to plead fraud with sufficient particularity.

[4] Defendants Humenansky, Cullinane and Sullivan each adopted and
incorporated by reference all of the applicable arguments in the Memoranda of Law
filed by each of the other Defendants.

3

## II.    THE PLAINTIFF'S COMPLAINT

### A.    Background

The Court accepts the following facts alleged in the Complaint as true for purposes of this decision. *See* Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975). The following summary represents a statement of facts according to the Plaintiff and does not constitute findings or a determination of any facts.

enivid, inc., f/k/a divine, inc. ("Divine" or the "Company"), a Delaware corporation, was founded in 1999 by Filipowski as an internet-holding company, known as an "incubator" company, engaged in business-to-business e-commerce through a community of associated companies. Prior to establishing Divine, Filipowski was a founder of PLATINUM technology, inc. ("Platinum") which was ultimately sold in 1999 for $3.6 billion. Filipowski had worked with each of the Defendants in some capacity while at Platinum. Humenansky had served as Platinum's Chief Operations Officer and Cullinane had served as its Executive Vice President and Chief Financial Officer. Sullivan had been Platinum's outside counsel. While at Divine, the Defendants held the following offices and positions:

| Name | Office | Director Status[5] |
|---|---|---|
| Filipowski | Chief Executive Officer<br>January 1, 2000 through May 23, 2003[6] | Board Member from January 1, 2000 until Effective Date of Confirmation of the Plan |
| Humenansky | President and Chief Operating Officer October 19, 2000 through May 23, 2003 | Board Member from January 1, 2000 until Effective Date of Confirmation of the Plan |
| Cullinane | Chief Financial Officer January 1, 2000 through May 23, 2003 | Board Member from January 1, 2000 until Effective Date of Confirmation of the Plan |
| Sullivan | Secretary and General Counsel October 19, 2000 through April 8, 2003 | Sullivan was not a Director |

As an incubator company, Divine promoted itself as providing management and other resources with the goal of taking companies in its portfolio public. Divine raised over $100 million in its initial public offering ("IPO") in July, 2000. In that year, Divine acquired interests in more than 50 associated companies (the "Associated Companies").

---

[5] In addition to Filipowski, Humenansky and Cullinane, the Board of Directors (the "Board") consisted of members who are not defendants in this action. *See* Am. Compl. at ¶¶ 193-94. The number of directors who served on Divine's Board at any given time is unclear from the Complaint. The Plaintiff conceded at the November 14, 2005 hearing that he has not alleged that a majority of the Board breached their fiduciary duties. Rather, he represented that only "select individuals," namely Filipowski, Humenansky and Cullinane, breached their duties as Board members. Tr. at p. 81-82.

[6] The employment termination date for each of Filipowski, Humenansky and Cullinane is subject to dispute.

The initial public offering market was evaporating in 2000, however, and Divine's incubator business failed to produce a single IPO for any of the Associated Companies.

Toward the end of 2000, many members of management believed that the incubator concept had failed and that Divine should pursue a new business strategy. In February 2001, Divine announced that it would acquire companies engaged in the "Enterprise Web Solutions" business and then integrate the acquired companies and their products and services into the portfolio of existing Divine products. Divine planned to reorganize and integrate the products and services of the Associated Companies into Divine's development, marketing, sales and support channels. This strategy presented significant operational and integrative challenges, in part, because the existing development, marketing, sales and support channels of Divine were in their beginning stages and also required significant development and integration efforts.

Divine actively implemented its new strategy in 2001 during which it acquired 20 companies, for which it expended almost $21 million in cash, issued more than 230 million shares of its common stock and assumed over $85 million in debt. Divine focused on acquiring financially distressed companies with operational concerns. A significant number of the acquired companies were in financial distress. While many of Divine's acquisitions helped to create the appearance of increased revenues, they failed to move Divine towards profitability. Through the first three quarters of 2001, Divine continued to incur operating losses and its cumulative operating losses for the first three quarters of 2001 totaled over $175 million. Filipowski was devoted to Divine's growth-by-acquisition

6

strategy. Many members of management of the Company, however, questioned this business plan because of the costs, negative effect on cash flow and operational challenges associated with the acquisitions. Noting the problems facing the Company, members of management attempted to direct Filipowski's focus toward operations rather than acquisitions. With mounting financial challenges, internal dissent began to grow.

One of the companies targeted for acquisition by Divine was RoweCom, Inc. ("RoweCom") which managed library orders of large institutions for publications. It placed orders with publishers and provided customer and ancillary services for libraries. While RoweCom's business did not fit within any of Divine's business spheres, the addition of RoweCom enhanced the appearance of Divine's gross revenues. RoweCom, however, was a financially distressed company, having operated at a loss for several years. Moreover, its operations historically resulted in cyclical cash flows throughout the year. RoweCom typically paid publishers in December or January of each year for subscription orders placed by its customers. As a result, RoweCom usually required additional funding in the fourth quarter when publisher payments were in excess of collections from customers. Divine's cash flow problems, as well as the lack of synergy between Divine and RoweCom's business, led some within Divine to question the acquisition. Humenansky and Sullivan, in particular, expressed their doubts about the acquisition through e-mails to Filipowski. During the due diligence process, Humenansky wrote: "I become less and less sure of this acquisition every day that goes by, since I just don't see a lot of benefit versus a lot of work. All others are right on, but this one I have a really bad feeling about."

Am. Compl. at ¶ 52. Similarly, on October 31, 2001, Sullivan wrote to Filipowski and other members of management:

> I may not do this justice from the financial modeling perspective, but the Cliff's Notes version is that RoweCom's financial position has deteriorated to a much worse position than I believe any of us were aware of. . . and we have been trying to get a handle on exactly how bad the situation is so that a reasonably informative report of the situation can be presented . . . before we close this deal.

Id. at ¶ 53.

Notwithstanding the misgivings of some managers, the Company completed the acquisition of RoweCom on November 6, 2001. This transaction placed Divine in the zone of insolvency as of November 30, 2001. Nevertheless, following the acquisition of RoweCom, Divine acquired eight additional companies (collectively the "Acquisitions"):

| Company Name | Date of Acquisition |
|---|---|
| Data Return Corp. | January 2002 |
| Northern Light Technology | January 2002 |
| Real World Technology Corporation | February 2002 |
| Perceptual Robotics, Inc. | February 2002 |
| Net Unlimited | February 2002 |
| Denalii, Inc. | April 2002 |
| Delano Technology, Inc. ("Delano") | July 2002 |
| Viant Corporation ("Viant") | September 2002 |

The completion of these Acquisitions created a number of economic and operational problems for the Company. The Defendants were aware of the

8

problems facing the Company and that they repeatedly attempted, to no avail, to direct Filipowski's focus toward operating Divine, rather than continuing acquisitions. Filipowski received numerous e-mails from Divine management about their concerns, but he dismissed or gave little credence to the opinions of senior management.     In the face of the repeated warnings from management about Divine's financial condition, Filipowski expressed his desire to move ahead with the Acquisitions.   None of the Defendants communicated their concerns about the Acquisitions to the Board which ultimately approved the transactions.

In the first quarter of 2002, Filipowski presented projections to the Board showing that the Company would achieve profitability by the end of 2002.   The business plan presented to the Board reflected that the Company would have $83 million in cash at the end of the first quarter of 2002.   "[A]ccording to Sullivan, these projections were dictated by Filipowski over the objections of Humenansky and other officers to secure the desired Board vote and neither Humenansky nor any of the other Defendants advised the Board that these numbers reflected revenue plans that were beyond levels believed achievable." Id. at ¶ 90.

By mid-March 2002, the Company's actual operating results indicated that the Company would miss the first quarter projections presented to the Board.[7]  This

---

[7] Divine ultimately reported a cash balance of $78.1 million for the first quarter of 2002, a discrepancy of less than $5 million from the original projection presented to the Board. Sullivan attributed achievement of this figure to Divine's withholding of payments for accounts payable.

9

gave rise to disagreements among the Defendants regarding the projections which would be delivered to the Board at the end of March 2002 for the next quarter. The Defendants engaged in numerous e-mails about the content of the financial materials to be included in the Directors' presentation packets, and many believed that Filipowski insisted on presenting the Board with overly aggressive revenue figures which were not achievable. Debates among Filipowski and management ensued. When Filipowski circulated his ideas for providing the Board with "good news" and making the overall numbers "look a lot better," Humenansky initially replied: "[The projections] are already aggressive. It's not worth the risk to me." Id. at ¶¶ 95 and 98. Filipowski concluded the debate, stating: "In the final analysis it is my call to make," to which Humenansky replied ". . . it is [Filipowski's] call to make. . ." Id. at ¶¶ 98 and 99. The projections Filipowski insisted on presenting to the Board were inflated and devoid of support. Despite the debate among management about the projections, the Defendants failed to pass information about the faulty projections to the Board.

In January 2002, Humenansky had warned Filipowski that the Company was running out of cash and that the Company could not continue to acquire other businesses because of the continuing depletion of cash resources. The Company's deteriorating cash position forced Filipowski and the Company to switch from acquisitions which were driven by Divine's business strategy, to acquisitions to obtain more cash for Divine's balance sheet. In February 2002, management

10

provided the Board with a detailed presentation regarding Divine's need to raise cash. The reasons included a lack of operating history and the marketplace perception of Divine as a "risky company," as well as the need to achieve revenue targets.

Divine was insolvent by the end of the first quarter of 2002, as the fair market value of its assets did not exceed its liabilities. Despite this fact, Filipowski remained focused on the acquisition strategy to obtain cash, at one point stating "we need to acquire cash even at drill bit prices." Id. at ¶ 110. Divine proceeded with the acquisitions of Viant and Delano which Filipowski believed would produce $90 million in cash for Divine. Humenansky's initial response to the Viant acquisition was "you must be kidding." Id. at ¶ 121. Later, he said: "They have zero pipeline and we are going to terminate almost everyone." Id. at ¶ 124. Despite the concerns regarding Viant, on September 27, 2002, the Company completed the acquisition. The Board minutes reflect that Humenansky did not notify the Board of his concerns about Viant, and that Filipowski, Humenansky and Cullinane voted in favor of the Viant acquisition. Although Divine originally pursued Viant to add more than $80 million in cash to its balance sheet, it completed the deal even though it only resulted in Divine adding $6.9 million in cash to its balance sheet.

The Delano transaction caused similar concerns. Humenansky wrote: "As we drill down into the Delano revenue numbers, there is a considerable amount that is bogus." Id. at ¶ 129. After learning of the potential acquisition of Delano,

11

Alekzander Szlam ("Szlam"), Divine's Chief Strategy Officer, wrote to Cullinane, Humenansky and other members of management that he was totally against the deal and that it would "kill" Divine.  On July 9, 2002, Ken Mueller ("Mueller"), the Company's controller, stated: "[Based on Delano's] update today, I don't think that we will net more than [$1-2 million] of cash from this transaction." He went on to say "if we are doing this deal for cash, we should call it off now." Id. at ¶ 147.  On July 31, 2002, the Company completed the Delano acquisition. The Board minutes reflect that none of the Defendants notified the Board of their concerns with regard to Delano and that Filipowski, Humenansky and Cullinane voted in favor of it.  The Delano Acquisition resulted in the addition of only $4.8 million in cash to Divine's balance sheet.

In April 2002, Divine began investment discussions with Oak Venture Partners ("Oak").  As a result, Oak agreed to provide $61 million in equity financing in exchange for more than 30% of Divine's capital stock. In May 2002, Oak made its first investment in Divine of $22.9 million, and, in July 2002, it invested an additional $38.7 million.  Despite these investments, Divine remained insolvent and continued to experience operational problems.  The acquisition pace made integration of operations difficult, if not impossible.  Divine had to terminate numerous employees upon the completion of each of the Acquisitions.  As a result, it incurred costs for large severance packages, and the acquired companies provided little value to Divine.

Beginning with the April 1, 2002 Board meeting, the Board began to consider fiduciary duties of a board of directors of a corporation which is in the "zone of insolvency."[8] At this meeting, in response to questions from the Board, Filipowski, Cullinane and Humenansky stated that expense and revenue targets presented to the Board were reasonable and attainable. In light of this information, the Board determined that "at the present time even under a 'zone of insolvency' analysis all relevant constituencies were best served by Divine continuing to operate under its current operating plan." Id. at ¶ 204.

On April 16, 2002, Humenansky e-mailed Filipowski stating that he was "ready to transition out of Divine" because "I just disagree with way too much anymore to support this going forward." Id. at ¶ 157. Throughout May 2002, Humenansky sent additional e-mails to Filipowski voicing his concerns about customer issues, employee retention and the "general feeling of failure" in the organization. On May 1, 2002, he wrote to Filipowski: "I feel the company is in a tailspin, and we need to make major changes," and, on May 22, 2002, he wrote: "I can't run the business going forward. . . I'm at the end of my rope now." Id. at ¶¶ 162 and 164. Despite the repeated statements of his intention to leave, Humenansky stayed with Divine until after the bankruptcy filing.

In connection with Divine's earlier acquisition of Eshare Communications,

---

[8] The Plaintiff alleged that the Company actually entered the zone of insolvency many months before in November of 2001 with the closing of the RoweCom transaction.

13

Inc. ("Eshare"), Eshare's Chief Executive Officer, Szlam, received options to "put" a significant number of shares of Divine's common stock. In April 2002, Szlam exercised his "put" options at a cost of almost $6.2 million to Divine. The Defendants did not advise the Board that Szlam exercised his put options until after Divine's Audit Committee Meeting on May 1, 2002, a decision which precipitated the resignation of an outside director of the Company.

On May 23, 2002, Mueller wrote to Filipowski, Humenansky and Cullinane regarding RoweCom France which had recently incurred more than $12 million in obligations due to overdrafts. RoweCom France was unable to repay the overdrafts and, as a result, auditors advised Divine that it should declare RoweCom France insolvent. Mueller outlined Divine's resulting financial obligations and the potential impact of the RoweCom France overdrafts on Divine in the second and third quarters of 2002. Filipowski responded saying "Less of an issue after Oak and Viant is [sic] done." Id. at ¶ 196. While the RoweCom France information was provided by Mueller specifically in advance of the Board Meeting scheduled later in the day of May 23, 2002, none of the Defendants communicated the information to the Board. At that meeting, the Defendants suggested that the Board continue considering the fiduciary duties of a director of a corporation which is in the zone of insolvency. Following the Board's consideration of this issue, it concluded that "all relevant constituencies were best served by the Corporation continuing to operate under its current operating plan." Id. at ¶ 198. The Board reached this

conclusion without the information that RoweCom France was insolvent.

Discussions about the zone of insolvency were frequent throughout 2002. The Board meeting minutes reflect that the Board discussed the matter for the first time on April 1, 2002 and again on May 13, 2002, May 23, 2002 and August 14, 2002. At these meetings, the Board consensus was the same: "after considering the rights and interests of Divine's constituencies, the Board determined . . . under a 'zone of insolvency' analysis, all relevant constituencies were best served by Divine continuing to operate under its current operating plan." There is no record that any of the Defendants spoke during Board meetings to advise the Board of Divine's true economic condition.

In July 2002, Divine disbanded its Mergers and Acquisitions unit. During the summer of 2002, Humenansky repeatedly warned that the Company was going to miss its third quarter projections and that it faced major cash flow problems for the fourth quarter. At the close of the third quarter, Divine's cumulative operating losses totaled $683.7 million since the Company's initial public offering in July 2000. In the fourth quarter, the annual RoweCom publisher payments loomed. When Divine entered the fourth quarter of 2002, it did not have sufficient cash or available financing to pay publishers for the periodicals RoweCom's customers had ordered and for which they had already paid. From and after the RoweCom acquisition, Divine had used monies from pre-paid subscriptions from RoweCom's customers to fund Divine's operations, not the subscriptions. Through much of the fourth

quarter of 2002, Divine was engaged in negotiations to sell RoweCom. By mid-December 2002, the Board determined that Divine was not able to continue to support RoweCom and was not in a position to finance the RoweCom year-end publisher payments. By the end of December 2002, Divine publicly announced that it was no longer willing to financially support RoweCom's operations. On January 27, 2003, RoweCom filed a Chapter 11 bankruptcy petition.

Once in bankruptcy, RoweCom filed an adversary proceeding against Divine seeking over $73 million in damages for, among other things, "looting" RoweCom. Thereafter, the United States Department of Justice and the Securities and Exchange Commission also began investigating the management of RoweCom and Divine. Moreover, in mid-November 2002, prior to RoweCom's decision to file a bankruptcy petition, Divine's auditors informed the Company that it would issue a "going concern" qualification in the absence of a definite operating plan for 2003. Divine explored several strategic alternatives, including the sale of its entire business or various divisions, however, the Company could not secure a buyer.

On February 25, 2003 (the "Petition Date"), Divine filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code"), and the Court subsequently consolidated the case with those of Divine's subsidiaries. Filipowski, Humenansky and Cullinane were still employed as officers on the Petition Date under the terms of their respective employment agreements (collectively, the "Employment Agreements"), and they continued to serve as

16

directors until the effective date of the Plan. The Company sold substantially all of its assets on May 15, 2003, and on May 22, 2003, it filed a Motion for an Order Authorizing Rejection of the Executory Employment Agreements. Filipowski, Humenansky and Cullinane objected to the motion, alleging that the Company had previously terminated their employment. Each of the Employment Agreements provided for large payments in the event of employment termination. The Plaintiff alleges that Filipowski, Humenansky and Cullinane timed the terminations of their employment agreements in an improper attempt to qualify the termination payments as administrative expense claims against Divine's bankruptcy estate at the expense of the general unsecured creditors. The Defendants filed a number of proofs of claim in which they asserted, *inter alia*, damages and administrative expense claims for termination of the Employment Agreements, indemnification for legal costs and expenses incurred in connection with their status as officers and directors of Divine, and general expense reimbursement.

B.      The Complaint

The Complaint is 113 pages, contains 411 paragraphs and alleges 16 counts against the Defendants. The causes of actions are as follows: (1) Count I, captioned "Breach of the Fiduciary Duty of Loyalty" against Filipowski, in his capacity as an officer and director of Divine; (2) Count II, captioned "Breach of the Fiduciary Duty of Loyalty" against Humenansky, in his capacity as an officer and director of Divine; (3) Count III, captioned "Breach of the Fiduciary Duty of Loyalty" against Cullinane,

17

in his capacity as an officer and director of Divine; (4) Count IV, captioned "Breach of the Fiduciary Duty of Loyalty" against Sullivan, in his capacity as an officer of Divine;[9] (5) Count V, captioned "Breach of the Fiduciary Duty of Care" against all Defendants, in their capacities as officers of Divine; (6) Count VI, captioned "Breach of the Fiduciary Duty of Good Faith" against all Defendants, in their capacities as officers of Divine; (7) Count VII, captioned "Deepening Insolvency" against all Defendants; (8) Count VIII, captioned "Objection to Indemnification Claims Fed. R. Bankr. P. 3007" against all Defendants; (9) Count IX, captioned "Objection to Duplicative Claims/Objection To Administrative Claims 11 U.S.C. § 502; Fed. R. Bankr. P. 3007" against Cullinane, Humenansky and Filipowski; (10) Count X, captioned "Objection to Employment Termination Claims 11 U.S.C. § 502; Fed. R. Bankr. P. 3007" against Filipowski, Cullinane and Humenansky; (11) Count XI, captioned "Objection to Expense Reimbursement Claims 11 U.S.C. § 502; Fed. R. Bankr. P. 3007" against Filipowski; (12) Count XII, captioned "Subordination" against all Defendants; (13) Count XIII, captioned "Avoidance and Recovery of Fraudulent Transfers 11 U.S.C. §§ 548; 550" against all Defendants; (14) Count XIV, captioned "Avoidance and Recovery of Preferential Transfers 11 U.S.C. §§ 547; 550" against all Defendants;[10] (15) Count XV, captioned "Objection to Claims filed by Retainer Defendants 11 U.S.C. § 502; Fed. R. Bankr. P. 3007" against all Defendants;

---

[9] As stated above, Sullivan was not a Director of Divine.

[10] The Plaintiff has pled this Count as an alternative to Count XIII.

18

and (16) Count XVI, captioned "Objection to Indemnification Claims Arising from Third Party Civil Actions 11 U.S.C. § 502; Fed. R. Bankr. P. 3007" against all Defendants. Counts I through VI shall be referred to herein as the "Fiduciary Duty Counts."

### III.   THE MOTIONS TO DISMISS

As noted above, the Defendants have each filed a Motion to Dismiss various counts of the Complaint against them pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7009 and 7012. Each of the Defendants adopt and incorporate by reference all applicable arguments in each other's briefs.

### A.   Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

When reviewing a Rule 12(b)(6) motion, the court must accept as true all material allegations of the complaint and construe the complaint in favor of the plaintiff. *See* Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975). Nevertheless, in determining a Rule 12(b)(6) motion, the Court need not credit unsupported conclusions. Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989), *overruled on other grounds,* Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004). The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957). "To the contrary, all the Rules require is 'a short and plain statement of the

claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (quoting Fed. R. Civ. P. 8(a)(2)). *See also* Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F. 3d 229, 237 (3d Cir. 2005)(under Federal Rule 8, the plaintiff need only plead the "basic facts" necessary to provide the defendant with fair notice of the plaintiff's claims and the general factual background upon which it rests and should not be deprived of the opportunity to pursue claims on a Rule 12(b)(6) motion for lack of detailed facts.).

Nevertheless, it also is well established that the pleading requirements are "not entirely. . . toothless," Dartmouth Review, 889 F.2d at 16. The First Circuit has required a minimal level of factual particularity rather than mere allegations of conclusions. *See* Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990)("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory.")(citing Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)).

B.    Standard for Dismissal Pursuant to Fed. R. Civ. P. 9(b)

Although Fed. R. Civ. P. 8(a)(2) requires the Plaintiff to plead a "short and plain statement of the claim," claims for fraud are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), made applicable to this proceeding by Fed. R. Bankr. P. 7009.   Pursuant to Rule 9(b): "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred

generally." Fed. R. Civ. P. 9(b).

The Defendants seek dismissal of certain counts of the Complaint pursuant to Rule 9(b) because they contend that the Plaintiff has failed to plead fraud and nondisclosure allegations with sufficient particularity. The Plaintiff counters that he need not plead any allegations with the specificity required by Rule 9(b) because he has not alleged causes of action based upon fraud. He adds that the allegations of misrepresentation and nondisclosure contained in the Complaint are merely components of his overall legal theory that the Defendants violated their duties by disregarding their own business judgment. While a number of the counts in the Complaint involve allegations of misrepresentation and concealment, the essence of the Complaint is that the Defendants abdicated their responsibilities through a number of infractions including reckless and irrational decision making, improper domination and control and failure to engage in debate at Board meetings about the questionable transactions. The allegations concerning misrepresentation and nondisclosure represent only examples of the Defendants' disregard of their business judgment, and the Defendants cannot recharacterize the Complaint as one based on fraud and seek to overcome it by reliance on Rule 9(b).

## IV    DISCUSSION

### A.    The Fiduciary Duty Counts

In evaluating the merits of the Defendants' Motions to Dismiss to the Fiduciary Duty Counts, the Court must consider two affirmative defenses, the

Delaware business judgment rule and the exculpatory clause contained in Divine's Certificate of Incorporation. These two defenses are the subject of many decisions in cases where defendants have sought dismissal of complaints containing allegations such as those in this adversary proceeding.

    1.    The Business Judgment Rule

The business judgment rule, "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds,* Brehm v. Eisner, 746 A.2d 244 (Del. 2000). The rule "operates as both a procedural guide for litigants and a substantive rule of law" in breach of corporate fiduciary duty cases. Citron v. Fairchild Camera and Instrument Corp., 569 A.2d 53, 64 (Del. 1989). "As a general matter, the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders." Orman v. Cullman, 794 A.2d 5, 22 (Del. Ch. 2002)(emphasis in original). With respect to the first element, interest ". . . means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders

22

generally." <u>Aronson</u> 473 A.2d at 812 (citations omitted); *see also* <u>In re GM Class H</u> <u>S'holders Litig.</u>, 734 A.2d 611, 617-18 (Del. Ch. 1999)(the benefits received must have been of a sufficiently material importance to the director, in the context of his economic circumstances, as to have made it improbable that he could perform his fiduciary duties to the shareholders without being influenced by his overriding personal interest).

On the separate question of independence, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." <u>Aronson</u> 473 A.2d at 816. Independence "... involves an inquiry into whether the director's decision resulted from that director being *controlled* by another." <u>Orman,</u> 794 A.2d at 25 n.50 (emphasis in original). Control may be demonstrated by a showing that the director is *dominated* by that other party, whether through close personal or familial relationship or through force of will. Id. (emphasis in original). A director can also be controlled by another if the challenged director is *beholden* to the allegedly controlling entity. <u>Id</u>. (emphasis in original). "A director may be considered beholden to . . . another when the allegedly controlling entity has the unilateral power . . . to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider

23

the corporate merits of the challenged transaction objectively." Id.

    2.    The Exculpatory Clause

Divine's Third Amended and Restated Certificate of Incorporation (the "Charter") contains a clause of the type which typically eliminates or limits the personal liability of directors for monetary damages for breach of the duty of care (the "Exculpatory Clause"). Under Section 102(b)(7) of the Delaware General Corporation Law[11] corporations can adopt charter provisions that eliminate or limit the personal liability of directors for monetary damages for breach of the duty of due care, but not claims based on breach of the duty of loyalty, intentional misconduct or knowing violation of the law. Divine's Charter contains the statutory

---

11. Del. Code Ann. tit. 8, § 102(b)(7) provides, in pertinent part:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> > (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. . .

language of Section 102(b)(7).  *See* Am. Compl. at ¶ 326.[12]

### B.    Count I-Breach of the Fiduciary Duty of Loyalty against Filipowski

In Count I of the Complaint, the Plaintiff alleges that Filipowski engaged in five general categories of wrongful conduct which were motivated by his self-interest: (1) approval of the Acquisitions and approval of the continued operation of Divine without a plan to achieve profitability; (2) participation in the manufacture of a "business judgement defense" in anticipation of litigation; (3) dissemination of false or inflated financial information to the Board and concealment of material information about the true condition of the company from the Board, including Divine's failure to meet projections, the insolvency of RoweCom France and Szlam's exercise of his put options; (4) failure to consider advice provided by other Divine officers; and (5) misrepresentation of his interest in, and the material personal gain he received from, Divine's acquisition of certain companies and properties in which he had a personal interest.

In seeking dismissal of Count I, Filipowski argues, that the Plaintiff has failed to sufficiently allege that he had a material self-interest or that he lacked the independence necessary to overcome the business judgment rule.  Additionally, he

---

[12] Ordinarily, a court may not consider any documents that are outside the complaint in the context of a Rule 12(b)(6) motion.  Documents which are sufficiently referred to in the complaint, however, become part of the pleading, and thus the document may be considered on a Rule 12(b)(6) motion.  Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).

argues that the Plaintiff has failed to plead causation of injury to Divine as a result of any wrongful conduct on his part, citing In re General Motors (Hughes) Shareholder Litig., No. Civ. A. 20269, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)("Without allegations to somehow link the accretion of a material benefit to the decision to approve the...transactions, the allegations of pecuniary self-interest are merely conclusory and not well pled."); Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990)("... the necessary factual averments are required with respect to each material element of the underlying legal theory."). In support of the latter argument, he asserts that the Plaintiff must allege that a majority of the voting Board members were self-interested or lacked independence, citing Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 460 (D. Del. 2004)("To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must 'plead facts demonstrating that a *majority of a board that approved the transaction in dispute was interested and/or lacked independence.'"(quoting     Orman v. Cullman, 794 A.2d 5, 23 (Del. Ch. 2002)(emphasis in original)). Otherwise, Filipowski argues, the disabling self-interest cannot be said to have caused the challenged decision.

1.     Self-Interest

The Plaintiff alleges that Filipowski's wrongful conduct was the product of the "self-interest of entrenchment" and that he was motivated solely or principally for the impermissible purpose of retaining office for personal reasons, citing Cede

26

& Co., v. Technicolor, Inc., 634 A.2d 345, 363 (Del. 1993)(further history omitted); In re Anderson, Clayton S'holders Litig., 519 A.2d 680, 688 (Del. Ch. 1986). Filipowski asserts that Count I should be dismissed because his interest in maintaining his salary, position, benefits and stock ownership coincided with the interest of the Company, citing Roselink Investors, LLC v. Shenkman, 386 F. Supp. 2d 209, 219-220 (S.D. N.Y. 2004)("[A]ny personal interest [a director] had in keeping [his company] out of bankruptcy was consistent with the best interests of [the company]. . .").

The Court finds that the Plaintiff's allegations concerning Filipowski's employment, stock position and perquisites, which constituted material benefits to him, coupled with his unwavering personal adherence to the acquisition strategy in the face of mounting operational and financial problems and warnings, especially from the Company's chief operating officer, permit a reasonable inference of the self-interest of entrenchment. The Court also finds that the self-interest exhibited by Filipowski, as detailed in the Complaint, was inconsistent with the interests of the Company and its creditors. The Plaintiff reproduced numerous e-mails in which members of Filipowski's own management team questioned the value of the acquisition targets, the Company's ability to absorb the acquired companies and the direction of the Company in light of its worsening cash position. Filipowski's typical response to these communications was a "damn the torpedoes" approach. His responses included the following statements: "We are going to go down the course we have set and the two options are it will either kill us or we will succeed.

. . I will not tolerate a strategy that give us 0 chance of succeeding and just kill us over a longer period of time." *See* Am. Compl. at ¶ 72; "Some of this takes time and perseverance. Constant vacillation is not the answer. . . This is the gut check time and we need to get the current strategy to mature and it will." Id. at ¶ 77. "We have got to draw the line and go for it." Id. at ¶ 233. Based upon these averments, the Court finds that the Complaint contains sufficient facts alleging that Filipowski's principal motivation in the performance of his duties was his desire to maintain his acquisition strategy by maintaining his position and office as the Company's chief executive officer. In the process of maintaining that strategy, Filipowski's interests were at odds with the interests of the Company.

   2.    Causation

The Court must next assess whether the Plaintiff has sufficiently pled that Filipowski's self-interested conduct caused injury to the Company and its creditors. The issue of causation is most crucial to the allegations in Count I which involve Filipowski's approval of the Acquisitions and the continued operations of Divine. Although the Plaintiff seeks to attribute responsibility for these decisions and transactions to Filipowski, they could not have been consummated absent approval of the majority of the Board. In the absence of facts alleging that a majority of the Board was either interested in the outcome of the disputed transactions or lacked the independence to consider the transaction independently, the Court would ordinarily have to presume that the Board acted loyally. *See* Orman v. Cullman, 794

28

A.2d 5, 22 (Del. Ch. 2002). The Court may, however, reasonably infer causation if there are sufficient facts in the Complaint to establish that the Board made the challenged decisions on the basis of false information provided by, or at the direction of, Filipowski or that it would not have made the decisions had it been in possession of the information concealed by, or at the direction of, Filipowski.

The Complaint contains a number of allegations which tend to undermine the Plaintiff's theory that the Board reached its ill-fated decisions as a result of Filipowski's wrongful conduct: "As Divine pursued yet another flawed strategy, its officers and board members repeatedly ignored the numerous warning signs." Am. Compl. at ¶ 4; "Despite being presented with overly optimistic projections, the Board was well aware of Divine's precarious financial condition." Id. at ¶ 116; "[T]he acquisition pace instigated by Filipowski, and approved by the Board, made integration of operations impossible." Id. at ¶ 150; "Despite numerous warning signals, including continued failure to meet projections, the Board did not question or investigate the information they received." Id. at ¶ 191; and "Rather than simply taking the necessary action to address Divine's problems and rein in Filipowski, [the officers and Board members] attempted to 'create' their own defense to the lawsuits they knew would be filed." Id. at ¶ 199.

The Court must weigh these allegations against the numerous allegations in the Complaint which suggest that the Board reached many of their critical decisions while in the possession of misinformation supplied by Filipowski or in the absence

29

of material information which was concealed by him and the other Defendants. These allegations include the Defendants' failure to disclose to the Board information regarding the viability of some of the acquisition targets and the questionable synergistic value these companies could deliver to Divine; the internal dissent within management regarding the Company's acquisition strategy and the operational and cash flow pressures it created; the Company's rapidly deteriorating financial condition while the Board conducted its "zone of insolvency" deliberations; factors which cast doubt on the achievability of the second quarter financial projections; Humenansky's statements to Filipowski that he intended to leave Divine over disagreements concerning the direction of the Company and the failure of the Defendants to communicate certain material events at Board meetings such as the insolvency of RoweCom France and the Szlam put exercise.

Faced with competing allegations in the Complaint, the Court must resolve the conflict by construing the Complaint in a light most favorable to the Plaintiff. See Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975). Bound by that standard, the Court concludes that the Plaintiff has pled sufficient allegations of causation regarding the Acquisitions and continued operation of the Company in Count I to overcome dismissal. In reaching this conclusion, the Court notes that it is most troubled by the allegations that Filipowski did not reveal the internal disagreements concerning Divine's acquisition strategy and its business plan to the Board. Had the Board been aware of the dissent among management,

it is reasonable to infer that the Board may have more closely scrutinized and reexamined the Company's strategy. Given the alleged conduct of Filipowski, it is also reasonable to infer that the Board lacked the ability to consider transactions objectively because pertinent information was withheld. The Court is currently constrained by the facts as alleged in the Complaint. This will not be the case at trial when the Court will require the Plaintiff to present evidence that the Board actually relied on inaccurate information when it approved each of the disputed transactions and/or that the Board would not have approved the respective transactions had it been aware of the information which was withheld by, or at the direction of, Filipowski.

The remaining allegations in Count I relate principally to Filipowski's personal conduct rather than decisions involving the Board. Specifically, the Plaintiff alleges that Filipowski breached his duty of loyalty to Divine by, *inter alia*, participating in the "business judgment defense," providing false financial information to, and concealing material information from, the Board, ignoring information and advice provided by Divine's other officers and misrepresenting his personal interest in certain Divine transactions.[13] The Court finds that the Plaintiff

---

[13] The Complaint alleges that Filipowski owned an interest in Goose Island (purchased by Divine from a Filipowski affiliate in July 2000 and later sold at a loss by Divine in July 2002) and that Filipowski owned an interest in and was a director of Opinionware.com (acquired by Divine in April 2001), iGive.com (no date of transaction provided in the Complaint), Panthera Productions (no date of transaction provided in the Complaint), Perceptual Robotics, Inc. (acquired by Divine in February 2002), Sequoia Software Corporation (no date of transaction provided in the Complaint), and

has pled sufficient facts to establish Filipowski's involvement in this conduct, and

for the reasons stated above, as well as because of the obvious injury the Divine

creditors have suffered, the Court finds adequate allegations of causation. The

Plaintiff, however, has failed to plead any facts with respect to Filipowski's alleged

misrepresentation of the Perceptual Robotics, Inc. transaction other than a

conclusory statement that he obtained a "material personal gain" from it. These

facts do not give Filipowski fair notice of the grounds of the Plaintiff's claim against

him. *See* In re Tower Air, Inc., 416 F. 3d at 237. The Court dismisses all claims in

Count I relating to Filipowski's alleged misrepresentation of his personal interest

in the companies enumerated in paragraph 267 of the Complaint. The Court denies

Filipowski's Motion to Dismiss all other claims in Count I of the Complaint.

### C.    Count II- Breach of the Fiduciary Duty of Loyalty against Humenansky

The Plaintiff alleges nearly identical misconduct against Humenansky in

Count II of the Complaint[14] as is alleged against Filipowski in Count I, except that

---

the National Transportation Exchange (no date of transaction provided in the Complaint). Other than with respect to the Perpetual Robotics transaction, the Plaintiff fails to allege in the Complaint that any of the aforementioned transactions in which Filipowski is alleged to have had a self-interest occurred during the zone of insolvency. Accordingly, the Court will only consider the Plaintiff's claim that Filipowski breached his duty of loyalty by misrepresenting his personal interest and gain from the Perceptual Robotics transaction.

[14] Count II also contains a claim based upon Humenansky's misrepresentation of, and material gain from, the Sequoia Software and National Transportation Exchange transactions. The Court allows Humenansky's Motion to Dismiss these claims because the Plaintiff failed to allege that the transactions involving these companies occurred during the zone of insolvency and because the allegations are insufficiently pled even

32

he asserts that Humenansky's loyalty to Divine was compromised as a result of his domination by Filipowski as well as by the self-interest of entrenchment. Humenansky argues that assertions of personal or business relationships, without more, are insufficient to rebut the presumption that he acted independently as a director, citing Beam v. Stewart, 845 A.2d 1040, 1050 (Del. 2004).

The Court agrees that a plaintiff must allege more than the existence of a personal or business relationship to support a breach of loyalty claim. Domination and control, however, are not tested merely by economics. In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 938 (Del. Ch. 2003). A plaintiff must allege some facts showing a director is beholden to an interested director in order to show lack of independence, Orman, 794 A.2d at 24. "The critical issue. . . is whether the director was conflicted in his loyalties with respect to the challenged board actions." Litt v. Wycoff, No. Civ. A. 19083-NC, 2003 WL 1794724, at *4 (Del. Ch. March 28, 2003). The quoted e-mails in the Complaint portray Humenansky as an often candid and objective critic of the Company's acquisition strategy. Humenansky contends that the e-mails on their face show the diligent discharge, not abdication, of his duties. The Court disagrees because the vocal dissent he exhibited when communicating with management was not apparent at Board meetings. The conduct alleged in the Complaint indicates a pattern whereby Humenansky issued numerous serious warnings about the Company's financial condition and direction and then retreated

---

under a notice pleading standard.

33

to a position of silence or, in some cases, approval at Board meetings at which the very transactions and strategies he questioned were effectuated.[15] *See* Am. Compl. at ¶¶ 78-82, 98-99, 121, 145, 147, 157-58, 209-10.  As set forth in the Complaint, Humenansky's repeated declarations of loyalty and deference to Filipowski, his failure to leave Divine after stating his intention to do so over his disagreements about strategy, and his reluctance to publicly challenge Filipowski's judgment in spite of the documented disagreements between the two, indicate that Humenansky was dominated by Filipowski and succumbed to his will to maintain the Company's acquisition strategy.  The allegations are more than conclusory statements, and they permit a sufficient inference that Humenansky lacked independence in the execution of his duties to withstand dismissal.  The Court reiterates its above rulings with respect to Count I and denies Humenansky's Motion to Dismiss Count I of the Complaint other than with respect to the claims involving National Transportation Exchange and Sequoia Software.

### D.    Count III- Breach of the Fiduciary Duty of Loyalty against Cullinane

---

[15] In his brief, Humenansky provides additional portions of Board meeting minutes which are not contained in the Complaint in an attempt to show that the Board was well informed when it deliberated over the Acquisitions and accordingly it adequately considered the merits of those transactions prior to approving them, relying on Alternative Energy, Inc. v. St. Paul Fire and Marine Ins., Co., 267 F.3d 30, 34 (1st Cir. 2001).  Notwithstanding any issue regarding the propriety of the Court's consideration of documents outside the Complaint in a Rule 12(b)(6) context, the Court finds nothing in those minutes which contradicts the Plaintiff's allegations that the Defendants withheld information from the Board or knowingly allowed the Board to consider misinformation.

The claims alleged in Count III against Cullinane are nearly identical to those in Counts I and II.[16]    As the Company's chief financial officer, Cullinane had a heightened responsibility for oversight and attention with respect to the Company's financial information.  Humenansky, Sullivan and other members of management copied Cullinane on many of the quoted e-mails detailing their concerns about the Company's direction and the Acquisitions. Cullinane also authored his own e-mails to Filipowski about the Company's cash position and his doubts about some of the Acquisitions.  In particular, Cullinane wrote to Filipowski on October 5, 2001 in connection with the Company's acquisition of Data Return, Inc., stating: "68 million [expletive] shares for a company running out of cash, losing $5 million per month. . .What am I missing?"  Id. at ¶ 69.  Cullinane did not convey his objections to the Board, and he later recommended the acquisition of Data Return to the Board.  He likewise voted in favor of a number of the other Acquisitions while aware of the internal debate surrounding them.    Additionally, Cullinane was copied on Filipowski's and Humenansky's e-mails regarding the 2002 second quarter financial projections submitted to the Board, and he was also informed of the RoweCom France insolvency crisis.  Despite Cullinane's possession of all of this information, the Plaintiff alleges that he never informed the Board of Divine's true economic condition or of the inaccurate financial information presented to them at the behest

---

[16] Count III contains a claim based upon Cullinane's alleged misrepresentation of and material gain from the National Transportation Exchange transaction.  As with the other insider transaction claims in the Complaint, this claim is inadequately pled. The Court allows Cullinane's Motion to Dismiss with respect to such claim.

of Filipowski.

Although Cullinane's warnings about the Company were typically less vehement than Humenansky's, he was privy to the objections raised by management about the Company's strategy and Filipowski's unwillingness to change its course. As with Humenansky, the Court can reasonably infer that Cullinane's silence in the face of so much negative information was a result of Filipowski's dominance. Based upon these averments, the Court finds adequate allegations in the Complaint to support Cullinane's domination by Filipowski and his resulting conflict of loyalty to the Company. The Court denies Cullinane's Motion to Dismiss with respect to Count III other than with respect to the claim set forth in paragraph 289 of the Complaint.

### E    Count IV Breach of the Fiduciary Duty of Loyalty against Sullivan

There are no claims in Count IV against Sullivan based on his approval of the Acquisitions or the continued operation of Divine,[17] and there are no allegations that he misrepresented any interest in or any gain from any entity purchased by Divine. Otherwise, the claims in Count IV mirror the claims against the other Defendants: dissemination of false financial information, concealment of material information from the Board and participation in the "business judgment defense."

Sullivan argues that the Plaintiff fails to identify any actionable decision or conduct by Sullivan which gives rise to any claim against him. Although Sullivan

---

[17] Sullivan was not a director of the Company.

36

is mentioned less frequently than the other Defendants in the Complaint, the Plaintiff has adequately alleged that Sullivan was privy to the same negative information possessed by the other Defendants which should have caused him, as general counsel to the Company, to advise the Board of the reckless course the Company was pursuing. Days before the completion of the RoweCom transaction, Sullivan sent a detailed e-mail to the other Defendants and members of management which highlighted and predicted all of the problems the acquisition of RoweCom would create for Divine. Yet he remained silent at a Board meeting the following day at which the acquisition was approved. Likewise, he had information about the faulty financial projections which, in a statement attributed to Sullivan by the Plaintiff, were "dictated by Filipowski over the objections of Humenansky and other officers to secure the desired Board vote. . ." Id. at ¶ 90. Sullivan's position is further compromised by the fact that he was not merely silent while in the possession of material negative information, but he allegedly led the efforts to create a business judgment defense while aware of that information. *See* Id. at ¶ 200. Although there are fewer references to Sullivan than the other Defendants in the Complaint, the overall theme is the same: that Filipowski so dominated the members of his inner circle that each failed to exercise his business judgment before the Board by keeping their misgivings secret. The Court denies Sullivan's Motion to Dismiss with respect to Count IV.

### F.    Count V-Breach of the Duty of Care against all Defendants

The same conduct alleged in Counts I through IV forms the basis for a breach of the duty of care claim in Count V against all Defendants, solely in their capacities as officers of Divine.  Presumably, the Plaintiff asserts these claims against the Defendants as officers to avoid the Company's Exculpatory Clause.

The fiduciary duty of care requires that officers and directors of a Delaware corporation "use the amount of care which ordinarily careful and prudent men would use in similar circumstances," Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125, 130 (Del. Ch. 1963), and "consider all material information reasonably available" in making business decisions.  Brehm v. Eisner, 746 A.2d 244, 259 (Del. 2000).  "[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference *to the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process involved."  In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996)(emphasis in original).  Whether a court "considering the matter after the fact, believes a decision substantively wrong, or . . . 'stupid' [or] 'egregious'. . . provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a *good faith* effort to advance corporate interests."  Id. (Emphasis in original).  When the conduct of a corporate board is challenged, Delaware courts ordinarily review that conduct under the presumption of the business judgment rule.[18]   However, "[the rule's] protections can only be

---

[18] The rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

claimed by disinterested directors." <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984).

In order to plead around the business judgment rule, a plaintiff must plead "a simple and brief statement of claims of irrationality or inattention [to give] directors and officers fair notice of the grounds of those claims." <u>Tower Air</u>, 416 F. 3d 229 at 239.

The Defendants argue that the breach of care claims should be dismissed because they are entitled to the full protection of Delaware's business judgment rule and the provisions of the Exculpatory Clause. The Plaintiff responds that neither the business judgment rule nor the Exculpatory Clause provide protection to officers whose conduct was, as here, in bad faith. To overcome the presumptions of the business judgment rule, the Plaintiff relies heavily on the standard articulated in <u>In re Walt Disney Co. Deriv. Litig.</u>, 825 A.2d 275 (Del. Ch. 2003). In that case, the plaintiffs alleged that the defendant directors breached their fiduciary duties when they approved an extravagant employment agreement with the company's president which was unilaterally negotiated by the company's chief executive officer and then failed to oversee the chief executive officer's dealings with the president regarding his termination. The plaintiffs alleged that the directors "failed

---

action taken was in the best interests of the company." <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984). Delaware courts have held that the business judgment rule covers officers and directors in actions involving directors, *see* e.g. <u>Cinerama, Inc., v. Technicolor, Inc.</u>, 663 A.2d 1156, 1162 (Del. 1995)(further history omitted), however, it is unclear whether the rule applies to corporate officers solely in their capacities as officers which is the context of Count V. The Court will presume for purposes of this opinion that the Delaware business judgment is available to the Defendants *as* officers of Divine as the Plaintiff has not argued otherwise.

to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties" to the corporation. Id. at 278. "In short the . . . complaint allege[d] facts implying that the . . . directors failed to 'act in good faith and meet minimal proceduralist standards of attention.'" Id.(quoting Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1052 (Del. Ch. 1996)). The Disney Court held that the business judgment rule did not apply, stating:

> "These facts, if true, do more than portray the directors who, in a negligent or grossly negligent manner, merely failed to inform themselves or to deliberate adequately about an issue of material importance to their corporation. Instead, the facts alleged. . . suggest that the defendant directors *consciously and intentionally disregarded their responsibilities*, adopting a 'we don't care about the risks' attitude concerning a material corporate decision."

Id. at 289 (emphasis in original).

The Court finds that the Plaintiff has sufficiently alleged that Filipowski consciously and intentionally disregarded his responsibilities to the Company's stockholders and creditors under the Disney standard. The facts of Disney are distinguishable from the instant case as they involved an abdication of oversight by the director defendants and an "ostrich-like" approach to material decision making. Here, the facts alleged indicate that Filipowski was actively involved in the oversight of the Company to the extent that he dominated the other Defendants. Although the facts of this case differ from those of Disney, this Court has little trouble characterizing the decision making process employed by Filipowski as irrational and reflective of a knowing and deliberate indifference to the potential

40

risk of harm to the Company.[19]   *See* Am. Compl. at ¶¶ 72, 77 and 110.   Because Filipowski's actions were either "not in good faith" or involved "intentional misconduct," the liability waiver available under the Exculpatory Clause cannot serve as a basis for dismissal of Count V against him. *See* <u>Disney</u> at 290. The Court finds that the Plaintiff has adequately alleged that Filipowski acted in an irrational, reckless or a grossly negligent manner and that the breach of due care claims against him are not subject to the defenses afforded by the business judgment rule or the Exculpatory Clause. Accordingly, the Court denies Filipowski's Motion to Dismiss Count V of the Complaint.

   With respect to Humenansky, the Court also finds sufficient support in the Complaint for a determination that he intentionally and consciously disregarded his responsibilities to the detriment of the Company.  The Humenansky e-mails may reflect the diligent discharge of his duties in some instances.  The facts alleged also depict the disregard of those duties at Board meetings at which the disputed transaction and strategies were approved.   <u>Id</u>. at ¶¶ 78, 145, 147, 158 and 179. Based upon the facts alleged, the Court finds that the decision making process employed by Humenansky was not rational and was not employed in good faith. Accordingly, the Court denies Humenansky's Motion to Dismiss Count V of the Complaint.

---

[19] The Court reiterates that it will be the Plaintiff's burden at trial to prove that the Board would not have approved the disputed transactions or the continued operation of the Company had it been aware of the information which was falsified or withheld by, or at the direction of, Filipowski.

With respect to Cullinane and Sullivan, the Court also finds adequate allegations in the Complaint to overcome the business judgment rule. They shared the same concerns about the Acquisitions and the Company's acquisition strategy, they withheld the same information about the inflated financial projections and they knowingly and intentionally remained silent before the Board about their concerns. They were silent regarding the truly crucial issues facing the Company, but were somehow meticulous in documenting discussions about their duties in light of the "zone of insolvency" at multiple Board meetings to foster the impression that they were exercising their business judgment. These actions were intentional and not merely negligent or grossly negligent. Based on these facts, the Court finds that Cullinane and Sullivan are not entitled to the presumption that they acted in good faith or in the best interests of the Company, and the Exculpatory Clause is unavailable as a defense to them. *See* Disney at 290. The Court denies Cullinane and Sullivan's Motions to Dismiss Count V.

## G.   Count VI-Breach of the Duty of Good Faith against all Defendants

The Plaintiff charges in Count VI that the Defendants breached their duty of good faith to Divine and its creditors by approaching the operation of Divine with a level of indifference or egregiousness that amounted to bad faith. Relying on the Disney standard, the Plaintiff alleges that the Defendants consciously and intentionally disregarded their responsibilities by knowingly failing to make decisions critical to Divine on an informed basis and by ignoring facts they knew to

be true.

Several Delaware cases have examined whether good faith is an independent fiduciary duty or a component of the traditional fiduciary duties of care and loyalty under Delaware law. *See* Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)(further history omitted)(referring to the duty of good faith as a separate duty within the triad of duties of good faith, loyalty and due care); *but see* In re Gaylord Container Corp. S'holder. Litig., 753 A.2d 462, 475-76, n. 41 (Del. Ch. 2000)(referring to good faith as a subsidiary requirement of the duty of loyalty). In Disney, the issue of good faith arose out of the board's failure to exercise their responsibilities, but the court did not definitively rule on whether an independent or separate duty of good faith existed. The Defendants assert that the duties of good faith and loyalty are synonymous, citing Roselink Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 221 (S.D. N.Y. 2004)(dismissing good faith claim and noting that Delaware law does not recognize an independent duty of good faith)(citing Orman v. Cullman, 794 A.2d 5, 14 (Del. Ch. 2002), and Emerald Partners v. Berlin, No. Civ. A 9700, 2001 WL 115340, at *64 n. 63 (Del. Ch. Feb. 7, 2001), *vacated by*, 787 A.2d 85 (Del. 2001)).[20] The Defendants argue that the Plaintiff has failed to plead a violation of the duty of loyalty and, therefore, he cannot assert any violation of good faith. Alternatively, the Defendants contend that the Plaintiff's Disney-type claim fails

---

[20] The Court notes that, on appeal, the Delaware Supreme Court found a "triad of primary fiduciary duties: due care, loyalty, and good faith." Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).

because the Complaint depicts the Defendants' efforts to address, not disregard, the challenges facing Divine.

Based on the Delaware Supreme Court's holding in <u>Emerald Partners</u>, Count VI is not redundant to the breach of loyalty claims. For the reasons stated above, the Court finds sufficient allegations of bad faith with respect to all Defendants. The Court denies the Defendants' Motions to Dismiss Count VI of the Complaint.

### H.    Count VII-Deepening Insolvency Against All Defendants

The Plaintiff advances a claim for "deepening insolvency" against the Defendants in Count VII. The term refers to the "fraudulent prolongation of a corporation's life beyond insolvency." <u>Baena v. KPMG LLP</u>, 389 F. Supp. 2d 112, 117 (D. Mass. 2005). Deepening insolvency claims are based on the theory that to the extent that liquidation is not already a certainty, the additional incurrence of debt or other actions make a salvageable situation impossible to the detriment of the corporation and its creditors. *See generally* <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.</u>, 267 F.3d 340, 349-50 (3d Cir. 2001)(construing Pennsylvania law). Recently, many decisions have examined the theory of deepening insolvency and whether it should be recognized as its own independent cause of action. *See generally* <u>Kittay v. Atlantic Bank (In re Global Service Group, LLC)</u>, 316 B.R. 451, 456-57 (Bankr. S.D.N.Y. 2004). This Court need not resolve whether the claim of deepening insolvency is a separate tort in this case because of the deficiencies in Count VII and because the theory is part of the other counts in the

44

Complaint.

As a basis for the deepening insolvency claim, the Plaintiff alleges that "[s]pecifically, after the Viant and Oak transactions were complete, the Defendants knew that Divine would not be able to obtain any more cash infusions. Notwithstanding that fact, the Defendants caused Divine to continue to conduct business and make acquisitions even after that time. . . with the result of spending most of Divine's last remaining cash reserves and increasing its debt load." Am. Compl. at ¶ 320.   According to the Plaintiff, the second Oak financing was completed in July 2002, the Company disbanded its mergers and acquisitions unit in July 2002, and the Viant Acquisition was completed on September 27, 2002. Id. at ¶¶ 140 and 145. The Plaintiff has pled no facts regarding any further acquisitions after Viant, and the Court must therefore presume that there were none.  To the extent Count VII relates to post-Viant and Oak transactions, it is deficient because there are no facts which support harm to the creditors.  To the extent Count VII is based upon the Board's decisions to conduct business after those transactions, the Court finds such claims to be subsumed within Counts I through VI.   The Court allows the Defendants' Motions to Dismiss Count VII with respect to all Defendants.

I. _Count VIII- Objection to Indemnification Claims under Fed. R. Bankr. P. 3007 against All Defendants_

Each of the Defendants filed proofs of claim against the Company's bankruptcy estate seeking, *inter alia*, indemnification for legal costs and expenses,

including any judgment or settlement obligations which may arise with respect to litigation against them regarding Divine (the "Indemnification Claims").    Article XII.A.1 of the Company's Charter provides that Divine shall indemnify its officers and directors "if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful."    Additionally, Article XII.B. of the Charter contains the Exculpatory Clause which protects directors for monetary damages for breach of the duty of due care, but not claims based on breach of the duty of loyalty, intentional misconduct or knowing violation of the law.  Based on the allegations set forth in Counts I through VIII, the Plaintiff alleges that the Defendants breached their duty of loyalty, engaged in intentional misconduct, did not act in good faith, and/or did not act in a manner the Defendants reasonably believed to be in the best interests of Divine.  As a result, the Plaintiff argues, the Defendants are not entitled to indemnification from Divine and the Indemnification Claims should be disallowed in their entirety.  The Defendants respond that Count VIII is dependent upon a viable breach of fiduciary duty claim which the Plaintiff does not have.  Pursuant to the Court's rulings with respect to Counts I through VI above, the Court denies the Defendants' Motions to Dismiss Count VIII.

J.    Count XII-Subordination against all Defendants[21]

In Count XII, the Plaintiff seeks to equitably subordinate the Defendants' proofs of claim to the claims of all other general unsecured creditors pursuant to 11 U.S.C. § 510(c) based on their inequitable conduct, as alleged in Counts I through VIII (the "Subordination Claims"). The Defendants argue that Count XII fails because the Plaintiff has not adequately pled "inequitable conduct" on the part of the Defendants or misconduct resulting in injury to creditors.

Section 510(c)(1) of the Code provides in pertinent part that "the court may–(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . ." 11 U.S.C. § 510(c). Section 510(c) of the Code "adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances." Allied Eastern States Maint. Corp. v. Miller (In re Lemco Gypsum, Inc.), 911 F.2d 1553, 1556 (11th Cir. 1990), rehearing denied, 930 F.2d 925 (11th Cir. 1991). Courts in Massachusetts have adopted the widely-accepted test for equitable subordination articulated by the Fifth Circuit in Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458

---

[21]    The Court will not address Counts IX through XI as none of the Defendants asserted grounds for dismissal of those Counts.

47

(5th Cir. 1991). *See e.g. Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir. 1992); *Aquino v. Black (In re AtlanticRancher, Inc.)*, 279 B.R. 411, 439 (Bankr. D. Mass. 2002); *In re Beverages Intl. Ltd.*, 50 B.R. 273 (Bankr. D. Mass. 1985). In *In re Fabricators*, the Fifth Circuit reiterated its three-prong test for equitable subordination first set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) as follows: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. 926 F.2d at 1464-65 (citing *Mobile Steel* at 700). The First Circuit has elaborated on the test as follows: "Although the remedy of equitable subordination has been applied relatively infrequently, it is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors." *604 Columbus Ave. Realty Trust*, 968 F.2d at 1359-60 (1st Cir. 1992).

When analyzing inequitable conduct, "[c]laims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts. . ." *Id.* at 1360. Harm to creditors is established if ". . .the party seeking equitable subordination demonstrates that the claimant's conduct harmed the debtor or its other creditors."

In re Mid-American Waste Systems, 284 B.R. 53, 71 (Bankr. D. Del. 2002). "There is no requirement that the purported misconduct or the harm it causes be a major cause of the debtor's bankruptcy. Id. "If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct." Liberty Mutual Ins. Co. v. Leroy Holding Co., Inc. (In re Fort Ann Express, Inc.), 226 B.R. 746, 757 (N.D.N.Y. 1998)(citing 604 Columbus Ave. Realty Trust, 968 F.2d at 1363).

The Court finds adequate facts in the Complaint to state a cause of action for equitable subordination of the Subordination Claims with respect to all of the Defendants.[22] All of the Defendants were officers and/or directors of the Company and thus were insiders of the Company, see 11 U.S.C. §101(31)(B)(i) and (ii), whose claims are subject to rigorous scrutiny. 604 Columbus Ave. Realty Trust, at 1360. With respect to the first prong of the Mobile Steel test, the Court finds the allegation of inequitable conduct against the Defendants to be adequately supported in Counts I through VI of the Complaint.     Additionally, the allegations concerning the attempts of Filipowski, Humenansky and Cullinane to secure administrative expense claims by terminating their employment contracts prior to the Company's rejection of those contracts sufficiently convey the misuse of their position and an

---

[22] Although § 510(c) deals with allowed claims, a determination as to whether a claim is subject to equitable subordination under § 510(c) may be made before the determination as to the allowance of the claim. U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.), 39 F.3d 556, 560 (5th Cir. 1994).

attempt to achieve unfair advantage over general unsecured creditors. *See* Am. Compl. at ¶¶ 255-257. Under the second prong of the <u>Mobile Steel</u>, the Court also finds sufficient allegations to support the likelihood of injury to creditors as the Defendants' conduct may have caused, or substantially contributed to, the bankruptcy of the Company and a circumstance where general creditors would be less likely to collect their debts. Finally, the Court finds that the subordination of the Defendants' claims would not be inconsistent with the Bankruptcy Code. Principles of equity would be offended by the allowance of the Defendants' claims in the event the Plaintiff prevails in this Adversary Proceeding, and such allowance would confer an unfair advantage on the Defendants and prejudice unsecured creditors. The Court denies the Defendants' Motions to Dismiss Count XII. Should the Plaintiff prevail at trial on the equitable subordination claims against the Defendants, they may still assert that subordination should be limited to the extent necessary to offset any harm suffered by the creditors.

K.  *Count XIII-Avoidance and Recovery of Fraudulent Transfers against all Defendants*
    *Count XIV-Avoidance and Recovery of Preferential Transfers against all Defendants*

Each of the Defendants have alleged in their proofs of claim that Divine is obligated to indemnify them for all legal costs and expenses which arise with respect to litigation against them regarding Divine. Divine paid a total of $275,000.00 in retainers (the "Retainers") on February 14, 2003 to various law firms for their representation of the Defendants in connection with governmental

investigations and other litigation against them in their capacity as officers and

directors of Divine.   The Retainer payments were made eleven days prior the

Petition Date and well after the Company entered the zone of insolvency.   The

Plaintiff asserts that the Defendants were not entitled to indemnification from

Divine and seeks to recover the Retainers as fraudulent transfer pursuant to 11

U.S.C. § 548(a) or, in the alternative, to avoid them as preferential transfers pursuant

to 11 U.S.C. § 547(b).[23]   The Defendants contend that the Complaint lacks the

---

[23] 11 U.S.C. § 548(a), as it was in effect at the commencement of this Adversary
Proceeding, provides in pertinent part:
(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or
any obligation incurred by the debtor, that was made or incurred on or within one
year before the date of the filing of the petition, if the debtor voluntarily or
involuntarily -
> (A) made such transfer or incurred such obligation with actual intent to
> hinder, delay, or defraud any entity to which the debtor was or became, on
> or after the date that such transfer was made or such obligation was incurred,
> indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such
> transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such
> obligation was incurred, or became insolvent as a result of such transfer or
> obligation. . .
11 U.S.C. § 548.

11 U.S.C. § 547(b), as it was in effect at the commencement of this Adversary
Proceeding, provides:
(b) Except as provided in subsection (c) of this section, the trustee may
avoid any transfer of an interest of the debtor in property-
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor
> before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made-
> > (A) on or within 90 days before the date of the filing of the
> > petition; or

51

allegations necessary to set aside Divine's indemnity obligation under its Charter and because the Plaintiff fails to plead with particularity that Divine paid the Retainers "with actual intent to hinder, delay, or defraud" creditors under § 548(a)(1)(A). Notwithstanding questions about the adequacy of the allegations of "actual intent" for purposes of § 548(a)(1)(A), the Court finds sufficient allegations to support the elements of § 548(a)(1)(B)(i) and (ii). The quoted provisions of the Charter contained in the Complaint expressly preclude indemnification in the event that an officer or director acted in bad faith or in a manner that they did not reasonably believe to be in the best interests of the Company. As stated above with respect to Count VIII, the Court finds adequate factual support in the Complaint to establish that the Defendants' conduct fell within the bad faith exception to the indemnification obligation. As a result, the Company may have had no obligation to pay the Retainers on the Defendants' behalf, and it would have received less than a reasonably equivalent value in exchange for the Retainer payments at a time when

---

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if-
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

52

it was insolvent. The Court denies the Defendants' Motions to Dismiss Count XIII of the Complaint.

In the event the Defendants are entitled to indemnification from the Company, the Plaintiff alternatively claims that the Retainer payments are avoidable as preferential transfers in Count XIV. The Defendants argue that the Retainer payments were not preferential transfers under § 547(b) because the Plaintiff fails to sufficiently allege that the Company paid the Retainers on account of an antecedent debt and because they were not creditors. *See* 11 U.S.C. § 547(b)(1) and (2). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . ." 11 U.S.C. § 101(5)(A). *See* Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.), 954 F.2d 1, 8-9 (1st Cir. 1992)(indemnification agreement created a right to payment contingent on a future occurrence and was a "claim" under the Bankruptcy Code). The Plaintiff's theory is that, if the Defendants' actions were not violations of their fiduciary duties, then they had "claims" against, and were owed "debts" by, Divine within the meaning of 11 U.S.C. § 101(12). Such debts were antecedent to the payments of the Retainers because they arose under Divine's Charter which was filed in July of 2000. *See* In re Mid-American Waste Systems, Inc., 228 B.R. 816, 822 (Bankr. D. Del. 1999)(a corporation's commitment to indemnify, as provided in the certificate of incorporation, existed at the time each of the officers and directors

commenced employment).

The Court finds that, if the Defendants are entitled to indemnification from the Company, such indemnification obligation was a contingent debt owed to the Defendants and incurred on the date when Divine first became obligated to indemnify them, namely the date of the filing of the Charter with the State of Delaware.[24] As such, the Retainer payments would have been paid "on account of an antecedent debt." The Court finds the other elements of § 547(b) to have been adequately pled, and the Court denies the Defendants' Motions to Dismiss Count XIV of the Complaint.

## V.    CONCLUSION

The Court will not address Counts XV or XVI as none of the Defendants asserted grounds for dismissal of those Counts.  For the above stated reasons, the Court denies the Motions to Dismiss in their entirety except for Count VII and those portions of Counts I through III which relate to the alleged misrepresentation by Filipowski, Humenansky and Cullinane of their interest and gain from the

---

[24] Or the date they were first employed by the Company if such date was after the filing of the Charter.

transactions enumerated in ¶¶ 267, 278 and 289 of the Complaint.  Upon the filing

of answers by the Defendants, the Court will issue a pre-trial order.


By the Court,

Joan N. Feeney
United States Bankruptcy Judge



Dated: July 12, 2006


55